# DISTRICT COURT OF THE UNITED STATES,

FOR THE

# DISTRICT OF VERMONT,

## OCTOBER TERM, 1844.

---

### IN THE MATTER OF EPHRAIM CHASE.

Where it appeared, that a bankrupt was insolvent on the first day of February, 1842, the day the bankrupt law went into operation, and that he made a voluntary confession of judgment on that day, in favor of one of his creditors, for a sum in damages exceeding the value of all his attachable property, and that all his property was taken the same evening, by virtue of an execution upon such judgment, and afterwards was sold thereon, and that this was done by the bankrupt for the mere purpose of compelling another of his creditors to make a deduction in the rent of a certain farm, which the bankrupt then occupied as his tenant, and which rent was to become due March 1, 1842, and if that could not be effected, then to defeat entirely the debt of that creditor, the debtor contemplating bankruptcy as the ultimate resort, and the petition in bankruptcy was filed March 30, 1842, the district court refused to grant to the bankrupt his discharge, notwithstanding the debt, upon which the judgment was confessed, was actually due at that time to the creditor in whose favor the confession was made.

THIS was a petition filed by Ephraim Chase, who had been duly decreed a bankrupt, for his discharge. The material facts are stated in the opinion delivered by the court.

*S. H. Hodges* for petitioner.

*E. Edgerton* for creditors.

The opinion of the court was delivered by

PRENTISS, J. The case, without going into unnecessary details, is shortly this. The bankrupt, on the first of February, 1842, as appears from his schedule, was deeply insolvent, being indebted to

various creditors to the amount of four thousand dollars, or more. Among the creditors was the firm of A. R. Vail & Co., to whom the bankrupt was indebted in a large sum. In the afternoon of the first of February the bankrupt confessed a judgment to A. R. Vail & Co. for the sum of $1624,71, embracing the amount of certain notes given originally to them and two or three notes executed to other persons and indorsed to them. Execution was immediately taken out on the judgment and in the evening of the same day was levied on all the property of the bankrupt liable to attachment, or execution. The property was sold on the execution for $1124,71, besides the costs of levy and sale.

It is to be borne in mind, that the confession of judgment by the bankrupt was without any previous attachment, and for a sum sufficient to cover all his property, with the power to issue immediate execution. Execution was immediately issued, and all his property, except household furniture and other property exempt from attachment, was immediately taken upon it. From the manner of the transaction, the suddenness and haste with which the proceedings were begun and carried through, the transaction, from the very statement of it, connected with the fact of the utter insolvency of the bankrupt, is liable to very strong suspicion.

But let us see how the case stands on the testimony; for it is proof, and not suspicion without proof, that is to decide it. There is no reason to doubt, that the debt of A. R. Vail & Co. was a *bona fide* debt; and it is true, that Aaron R. Vail, one of the company, says he called on the bankrupt for security, and that the judgment was confessed on his request, as a means of saving cost. This testimony might be material, if the judgment had been for an amount covering only a part of the bankrupt's property; but the judgment being for an amount sufficient to absorb the whole of his property, and he being necessarily conscious, that it must take the whole to satisfy it, it is immaterial, whether it was given on the request and at the instance of the creditors, or not. But admitting it to be material, and that the request was accompanied with such a degree of urgency and importunity on the part of the creditors, as would, under ordinary circumstances, repel the presumption of the confession being voluntary, yet the question is, whether the confession was really made in consequence of that importunity, or with a view,

In the matter of Chase.

entertained and acted upon altogether independent of it, of defeating the rights of other creditors. This is a question of intention, and the intention is to be collected from all the circumstances of the case. If they clearly indicate an intention, on the part of the bankrupt, to give a preference, or to have all his property put beyond the reach of his other creditors by means of the judgment, the request or importunity of the creditors can avail nothing.

We have already stated the manner of the transaction; now let us look to some other circumstances, which attended it. Besides there appearing to be no unwillingness to make the confession, but a very ready acquiescence and compliance on the part of the bankrupt, it is evident, that he knew, at the time of the confession, that the execution would be levied the same evening. He told Harrison Ballard, in the evening, before the officer came, that he wanted to pay him, as he expected his creditors would break upon him; and he accordingly forthwith turned out to Ballard a cow, and at the same time turned out to his brother forty bushels of corn in the ear. After the officer had arrived, he told Marcus Bartlett, that he had expected him, and had tried to give Bartlett a hint of it before. And Aaron R. Vail, one of the creditors, says, he thinks the bankrupt might have understood, that the execution was to be levied the same evening after the confession of the judgment.

But farther, the bankrupt told William B. Haskins, who went to see that the officer did not take some grain the bankrupt had turned out to him, that the creditors would not take any thing he did not want they should take. He also told Ballard, at the time he turned out the cow to him, that the creditors would not take any property, which was turned out to him, or his brother, though it remained there.

The testimony, thus far, gives the transaction the appearance, at least, of being a very amicable one; for it shows, that the bankrupt supposed, and acted under the belief, that there was a very good understanding subsisting between him and the execution creditors. Indeed, the transaction seems to have very little of an adverse character about it. When the officer came, who, as we have seen, was not an unexpected, and, I should judge, not an unacceptable visitor, the bankrupt, anticipating the wishes of this usually unwelcome functionary of the law, very promptly lighted his lantern and went

with him to the barn, lighting him to where the property was. This, to be sure, of itself, is not a very important circumstance, but, being one of the characteristics of the transaction, disclosed by the testimony, it is not unworthy of notice with the others.

But the most material part of the testimony remains to be stated. It appears, that the bankrupt, at the time of the confession of judgment, held a lease from Caleb Paris of a farm in Danby, for the term of six years from the first of March, 1837, at an annual rent of $700,00. Besides the rent for the year 1842, which was unpaid, he was indebted to Paris in the sum of $500,00, for cattle received from him by virtue of the lease. When the latter sum would be payable does not appear ; but the rent would become due the first of March, and the lease would not expire until one year from that time.

Now, Stephen Roberts testifies, that, before the property was taken in execution, the bankrupt told him, that unless he could make an arrangement with Paris, and get a reduction of the rent, he should not pay him, though he could ; and after the property was taken, he told the witness, he expected to have the property back, if he succeeded in making an arrangement with Paris, which he thought he should be able to do. Allen Roberts also testifies, that the bankrupt told him, that he did not know but he should have all the property back, if he could make an arrangement with Paris. And Caleb Buffum says, that after the property was taken, the bankrupt told him, that he could not afford to pay so much rent for the farm ; that he would give $350,00 for the year's rent then due, and had the money in his pocket to pay it, and would give $400,00 a year for the remainder of the term. On the witness' inquiring how he could carry on the farm without the stock and tools, he replied, that he could have back the property, which had been taken, whenever he pleased. Now, upon this testimony, can any one be at a loss concerning the motive and object of the bankrupt, in giving the confession of judgment? Was it not to bring Paris to terms, and force him to reduce the rent of the farm, by presenting to him the alternative of doing so or getting nothing?

The testimony of Vail, one of the execution creditors, goes rather to confirm this view of the case, than otherwise. He says, there

was no understanding with the bankrupt, that he should have back the property levied upon, except through an arrangement proposed by A. R. Vail & Co. to Paris, that if he would reduce the rent of the farm to three hundred and fifty or four hundred dollars, they would become responsible for the rent, and the property might go back into the hands of the bankrupt; which proposition, Vail says, was made at the suggestion of the bankrupt after the levy of the execution. This proves, that after the execution was served, and all the property of the bankrupt was secured by seizure upon it, a proposition to reduce the rent, and have the property go back into the hands of the bankrupt, was in fact made to Paris. Now, was this proposition the offspring of a mere afterthought, first suggested after the levy of the execution, or did it originate in a preconceived design, existing at and before the confession of judgment? If no such design is proved to have been entertained by the creditors, the presumption is strong from the testimony, that the bankrupt had the matter then in contemplation; for, before the property was taken, and, we may conclude, before the confession of judgment, for one followed the other almost immediately, he told Stephen Roberts, as we have already seen, that unless he could make an arrangement with Paris, and get a reduction of the rent, he should not pay him. Taking, then, the declarations of the bankrupt before and after the confession of judgment, and putting them together, I think it must be inferred, that he consented to the judgment willingly, knowing that all his property would be immediately taken in execution, and expecting by that means to get the rent reduced, and then have the property restored to him.

There is another part of the testimony, which ought not to be omitted. It appears, that thirteen cows seized on the execution were afterwards returned to the bankrupt, kept by him ten or twelve days, and then sold by him to a clerk in the store of one of the execution creditors. The bankrupt, on his examination, says the cows were returned to him in consequence of a question arising, whether the cows belonged to him or to Paris; that he sold them to make a payment on the execution; and that after the sale they were driven away in the night time, for the purpose of concealing from Paris where they were.

From all the circumstances of the case, I repeat, I am forced to

In the matter of Chase.

the conclusion, that the confession of judgment was voluntary on the part of the bankrupt, and was given for the purpose of compelling Paris to reduce the rent of the farm, and, if that could not be effected, then to defeat his debt entirely, contemplating bankruptcy as the ultimate resort. The confession of judgment was on the first of February, the day the bankrupt law went into operation; the rent became due to Paris the first of March, and the petition in bankruptcy was filed the thirtieth of March; all following on in regular succession, and all taking place within the space of two months. From the view I have taken of the case, it follows, that the bankrupt is not entitled to a discharge; and a discharge is accordingly refused him.